## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ALVINE ABANDA ET AL.,

    Plaintiffs,

v.

OURBLOC LLC ET AL.,

    Defendants.

Civil No. 23-1071-BAH

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION

Pending before the Court is a motion for default judgment (the "Motion") filed by Plaintiffs Alvine Abanda ("A. Abanda"), Anna Bolima ("A. Bolima"), Dereje Yadeta ("Yadeta"), Elvis Fohtung ("Fohtung"), Emelda Ntinglet ("Ntinglet"), George Jing ("Jing"), Jane Mwangi ("Mwangi"), Jean Mukong ("Mukong"), Jella Kaspa ("Kaspa"), Julia Ndumu ("Ndumu"), Lum Fube ("Fube"), Margaret Tamukong ("Tamukong"), Nelson Bolima ("N. Bolima"), Nelson Bolima, Jr. ("N. Bolima, Jr."), Odette Kemvo ("Kemvo"), Oladokun Oladitian ("Oladitian"), Regina Michael ("Michael"), Rose Abanda ("R. Abanda"), Saba Wolteji ("Wolteji"), Theodosia Fobella ("Fobella"), and Veronica Zeh ("Zeh") (collectively, "Plaintiffs"). ECF 35. Defendants, a number of Delaware limited liability companies, including OurBloc LLC ("OurBloc"), CreditDap LLC ("CreditDap"), DapLabs LLC ("DapLabs"), BlocRealty LLC ("BlocRealty"), BlocGroup LLC ("BlocGroup"), BlocMedia LLC ("BlocMedia"), and DapConcierge LLC ("DapConcierge") (collectively, "Company Defendants"), as well as individual Armel Tenkiang ("Tenkiang" and collectively, "Defendants"), did not respond to the Motion, and the time to do so has expired. The Court has reviewed all relevant filings and finds that no hearing is necessary.

*See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Plaintiffs' Motion is **GRANTED IN PART AND DENIED IN PART.**

## I.   BACKGROUND

Plaintiffs filed the complaint on April 20, 2023, alleging violations of "securities laws" (count I), breaches of contracts (count II), unjust enrichment (count III) (pled in the alternative to count II), securities fraud (count IV), and fraud in the inducement (count V). *See* ECF 1. The complaint alleges that Tenkiang "perpetrated [an investment] scheme by offering investors the opportunity to invest in purported proprietary cryptocurrency tokens and High Yield Savings Accounts ('HYSAs')." *Id.* at 5 ¶ 1. Plaintiffs allege that "the cryptocurrency tokens and HYSA investment contracts were [actually] unregistered securities sold in violation of the Securities Act, and the funds claimed to be invested were in fact commingled and used to pay returns to earlier investors with substantial amounts misappropriated for Mr. Tenkiang's personal use." *Id.*

Plaintiffs allege that Tenkiang created the Company Defendants in order to perpetrate the scheme. *See* ECF 1, at 7–8 ¶¶ 14–15. According to Plaintiffs, each Company Defendant is incorporated and has its principal place of business in Delaware. *Id.* at 5–6 ¶¶ 4–10. DapLabs, CreditDap, and BlocGroup are all subsidiaries of OurBloc, and CreditDap is also a subsidiary of DapLabs. *Id.* ¶¶ 5–7. BlocRealty is a subsidiary of both CreditDap and BlocGroup. *Id.* at 6 ¶ 8. DapConcierge is a subsidiary of BlocMedia, which is a subsidiary of CreditDap. *Id.* ¶¶ 9–10.

According to the complaint, Tenkiang created OurBloc in May 2016 "for the purpose of securing investors in cryptocurrency and related blockchain products" and "formed [DapLabs] to hold his purported proprietary DAP token and engage in specialized blockchain research." *Id.* at 8 ¶¶ 15–16. "Mr. Tenkiang formed [CreditDap] to promote and run operations related to [a] HYSA product," in which "investors were encouraged to deposit funds in exchange for a high yield, and guaranteed return, in full, of their principal investment at the end of the contract." *Id.* ¶¶ 17–18.

2

Each of the Plaintiffs contracted with CreditDap between March 2021 and March 2022, each investing between $10,000 and $850,000 into a HYSA for a specified period of months in order to reap a high return yield.[1]  *See id.* at 12–16 ¶¶ 29–49.  Each of these contracts included a provision that:

> Should any issues arise with the platforms being used to earn yield, CreditDap LLC will return [investor name] his/her deposit in full. [Investor] can withdraw his/her principal at any time before the [] month period is over for a 15 percent penalty and forfeiture of profits accrued during the last 12 months.

ECF 1, at 16 ¶ 50 (alterations in complaint); *see also, e.g.*, ECF 1-1, at 4 (contract of A. Abanda); ECF 1-2, at 4 (contract of A. Bolima); ECF 1-3, at 4 (contract of Yadeta); ECF 1-4, at 4 (contract of Fohtung); ECF 1-5, at 4 (contract of Ntinglet); ECF 1-6, at 4 (contract of Jing); ECF 1-7, at 4 (contract of Mukong); ECF 1-8, at 4 (contract of Kaspa); ECF 1-9, at 4 (contract of Ndumu); ECF 1-10, at 4 (contract of Fube); ECF 1-11, at 4 (contract of N. Bolima); ECF 1-12, at 4 (contract of N. Bolima, Jr.); ECF 1-13, at 4 (contract of Kemvo); ECF 1-14, at 4 (contract of Michael); ECF 1-15, at 4 (contract of R. Abanda); ECF 1-16, at 4 (contract of Wolteji); ECF 1-17, at 4 (contract of Fobella); ECF 1-18, at 4 (contract of Zeh).  After Plaintiffs "fully performed under each of the Contracts by depositing the agreed upon funds with [CreditDap]," CreditDap "paid some yield amounts out to Plaintiffs under their respective contracts, but failed to pay the full amount guaranteed."  ECF 1, at 17 ¶¶ 51–52.  Despite paying some yields, in April 2022, CreditDap

---

[1] Attached to the complaint are copies of each of the contracts Plaintiffs entered into with CreditDap, except for Mwangi's, Tamukong's and Oladitian's.  *See* ECF 1-1 (contract of A. Abanda); ECF 1-2 (contract of A. Bolima); ECF 1-3 (contract of Yadeta); ECF 1-4 (contract of Fohtung); ECF 1-5 (contract of Ntinglet); ECF 1-6 (contract of Jing); ECF 1-7 (contract of Mukong); ECF 1-8 (contract of Kaspa); ECF 1-9 (contract of Ndumu); ECF 1-10 (contract of Fube); ECF 1-11 (contract of N. Bolima); ECF 1-12 (contract of N. Bolima, Jr.); ECF 1-13 (contract of Kemvo); ECF 1-14 (contract of Michael); ECF 1-15 (contract of R. Abanda); ECF 1-16 (contract of Wolteji); ECF 1-17 (contract of Fobella); ECF 1-18 (contract of Zeh); *see also* ECF 1, at 13 ¶ 35 (explaining that "Ms. Mwangi no longer has a copy of her contract with [CreditDap]"); *id.* at 14 ¶ 40 (same regarding Tamukong); *id.* at 15 ¶ 44 (same regarding Oladitian).

3

"communicated to investors that it was experiencing difficulties and would be returning to each investor the respective principal amounts invested in the HYSAs" and informed investors via email that "it was terminating the HYSA program (the 'Termination')." *Id.* ¶¶ 53–54; *see also* ECF 1-19.

Plaintiffs allege upon information and belief that the money they purportedly invested in the HYSA program was "diverted, commingled, and used for other purposes including to pay yields to earlier investors, with substantial amounts misappropriated by Mr. Tenkiang for personal use and to fund other unrelated investments and businesses." ECF 1, at 10 ¶ 24. Plaintiffs further allege that in a text message conversation with a staff member who expressed concern about "conserve[ing] some money" and "cut[ting] down on the spending and trips," Tenkiang responded that "[t]he money is mine [I] can do what [I] want." *Id.* at 10–11 ¶ 25. Some Plaintiffs have been partially reimbursed their principal investments, but no Plaintiff has been repaid in full. *Id.*, at 18 ¶ 55.

After Plaintiffs filed the instant complaint, the Company Defendants were served. *See* ECF 3 (service on OurBloc LLC), ECF 4 (service on CreditDap), ECF 5 (service on DapLabs), ECF 6 (service on BlocRealty), ECF 7 (service on BlocGroup), ECF 8 (service on BlocMedia), ECF 9 (service on DapConcierge). After each failed to respond to the complaint and upon motion, the Clerk entered default against each. *See* ECF 11. Tenkiang was also served. ECF 20. When he failed to respond and upon Plaintiffs' motion, the Clerk entered default against him. *See* ECF 26.

After a "motion to appoint counsel" was filed on behalf of the Company Defendants by someone who was not a member of this Court's bar, ECF 23, the Court struck that motion as improperly filed and further indicated that companies are not entitled to appointment of counsel. *See* ECF 31. Mail sent to Tenkiang at the 906 Mather Drive address listed on the complaint, ECF

1, at 4, was returned as undeliverable. *See* ECF 29. Plaintiffs' counsel filed a notice indicating that the return label with the notation "no such street" was incorrect, and that Tenkiang lived at that address. *See* ECF 30. Mail sent to Tenkiang at the 906 Mather Drive address was again returned undeliverable. *See* ECF 32. The Court directed Plaintiffs to file a status report as to Tenkiang's address, as the notice of default had yet to be served on Tenkiang. *See* ECF 33. In a status report, Plaintiffs contend that Tenkiang's address is correct but that they "have reason to believe, based on reports from the investigators, that Mr. Tenkiang's relatives, who also reside at the address provided, are inaccurately claiming that he is not residing there and are rejecting mail about this case directed to him." ECF 34, at 2. The case was then reassigned to the undersigned. Subsequently, Plaintiffs filed the instant Motion as to all Defendants. ECF 35. The Motion includes as exhibits declarations from each Plaintiff, including an "omnibus" declaration from Jing, and copies of the contracts for each Plaintiff that retained a copy. *See* ECF 35-1 through 35-22. The motion also includes a declaration of Timothy Hyland, counsel for Plaintiffs, and a copy of a private investigator's report which indicates that Tenkiang does indeed reside at the 906 Mather Road address.[2] *See* ECF 35-23.

## II.   LEGAL STANDARD

After a court enters default pursuant to Rule 55(a), the party seeking to recover must generally move the court for default judgment.[3] Fed. R. Civ. P. 55(b). The Fourth Circuit has a

---

[2] The Court also takes judicial notice that a publicly available parcel search of New Castle County records reveals that "906 Mather Drive, Bear DE 19701" does exist and is apparently currently owned by an individual named Jessie A. Tenkiang. *See* "Parcel # 1202000197," New Castle County, Delaware, available at https://www3.newcastlede.gov/parcel/Details/Default.aspx?ParcelKey=228709 (last visited Aug. 22, 2024). However, the search also indicates that, as of August 22, 2024, "[p]roperty transfers related to recent parcel ownership changes are currently being processed." *Id.* This suit does not name as a defendant anyone with the name Jessie.

[3] "In claims arising out of supplemental jurisdiction, district courts apply federal procedural law and state substantive law." *Stover v. Coll. of William & Mary in Virginia*, 635 F. Supp. 3d 429,

"strong policy" that "cases be decided on their merits." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993). However, "default judgment may be appropriate when the adversary process has been halted because of an essentially unresponsive party." *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).

In reviewing a motion for default judgment, the Court accepts as true the well-pleaded factual allegations in the complaint as to liability. *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780–81 (4th Cir. 2001). It remains for the Court, however, to determine whether these unchallenged factual allegations constitute a legitimate cause of action. *Id.*; *see also* 10A Wright, Miller & Kane, Federal Practice and Procedure § 2688.1 (4th ed.) ("Liability is not deemed established simply because of the default . . . [and] the court, in its discretion, may require some proof of the facts that must be established in order to determine liability."). In considering the question of liability on a motion for default judgment, the Court "must . . . determine whether the well-pleaded allegations in [the plaintiffs'] complaint support the relief sought in this action," *Ryan*, 253 F.3d at 780, and applies the pleading standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *see Joe Hand Promotions, Inc. v. Adilio*, Civ. No. 23-712-PX, 2024 WL 2977869, at *2 (D. Md. June 13, 2024) (citing *Balt. Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 544 (D. Md. 2011)). "[T]he [C]ourt 'need not accept the legal conclusions drawn from the facts, and [ ] need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Monroe v. City of Charlottesville*, 579 F.3d 380, 385–86 (4th Cir. 2009) (third alteration in *Monroe*) (quoting *Jordan v. Alternative Res. Corp.*,

---

445 (E.D. Va. 2022) (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 92 (1938) (Reed, J., concurring in part); *Guaranty Trust Co. v. York*, 326 U.S. 99, 109 (1945); *Mason and Dixon Intermodal, Inc. v. Lapmaster Intern. LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011); *Barton v. Clancy*, 632 F.3d 9, 17 (1st Cir. 2011)).

458 F.3d 332, 338 (4th Cir. 2006)). Default judgment is not warranted "if the complaint offers only 'labels and conclusions' or 'naked assertion[s] devoid of further factual enhancement'" such that the complaint fails to state a claim for relief. *Brophy*, 771 F. Supp. 2d at 544 (alteration in *Iqbal*) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

The party seeking a default judgment must provide sufficient factual and legal support for its request for damages and, if appropriate, attorney's fees. *See Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) (noting that except where the amount of damages is certain, the court must make an independent determination of damages in reviewing a motion for default judgment and may rely on detailed affidavits or documentary evidence to determine the appropriate sum); *Lawbaugh*, 359 F. Supp. 2d at 422 ("Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not.").

Rule 54 is clear that a "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c); *see also Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 794–800 (D. Md. 2010). "The rationale is that a default judgment cannot be greater than the specific amount sought because the defendant could not reasonably have expected that his damages would exceed that amount." *In re Genesys Data Techs., Inc.*, 204 F.3d 124, 132 (4th Cir. 2000).

## III.   ANALYSIS

Plaintiffs posit that all Defendants have been properly served, have failed to respond to the complaint, and are in default on each of the five counts alleged in the complaint. *See* ECF 35. The Court addresses each count in turn.

**A.      Liability**

    1. .      Count I: Violation of Securities Laws

Count I of the complaint alleges that Defendants violated securities law. *See* ECF 1, at 18–

19 ¶¶ 57–62. Beyond stating that each of the contracts made between Plaintiffs and CreditDap

"constitute[s] an investment contract as defined in 15 U.S.C. §[] 77b(a)(1)," *id.* at 18 ¶ 58, the

complaint does not cite a particular securities statute allegedly violated by Defendants. In the

motion for default judgment, Plaintiffs argue that:

> Defendants unlawfully made use of means or instruments of communication in
> interstate commerce and of the mails, including by the internet, electronic mail,
> online social media, electronic messaging platforms, and other means, for purpose
> of offering, selling, or delivering securities not registered with the Securities and
> Exchange Commission ["SEC"], in the form of the Contracts, in direct violation of
> applicable securities law, including, for example, the Securities Act of 1933.

ECF 35, at 16. In a footnote, Plaintiffs cite Section 5 of the Securities Act of 1933, 15 U.S.C. §

77e. *See* ECF 35, at 16 n.3. The elements of the claim for violation of securities law cited by

Plaintiff also make clear that they bring count I under Section 5 of the Securities Act. *See* ECF 1,

at 18 ¶ 60 ("Defendants unlawfully made use of means or instruments of communication in

interstate commerce and of the mails for the purpose of offering, selling, or delivering unregistered

securities, in the form of the Contracts, in direct violation of securities laws."); ECF 35, at 15

(quoting *SEC v. Bennett*, 2022 WL 279826, Civ. No. 17-2453-PX, at \*4 (D. Md. Jan. 28, 2022)).[4]

The Court will therefore evaluate the allegations as to count I under Section 5 of the Securities

Act, 15 U.S.C. § 77e.[5]

---

[4] Though Plaintiffs' Motion cites page \*3, the quoted material appears on page \*4 of the opinion.

[5] Because Plaintiffs have not cited any other statutory authority under which they bring this claim,
the Court will not construe count I as alleging a violation of any other securities law.

To state a claim under Sections 5(a) and 5(c) of the Securities Act, a plaintiff "must demonstrate that [the defendant] (1) through means of interstate commerce; (2) directly or indirectly offered or sold; (3) securities unregistered with the Securities and Exchange Commission." *Bennett*, 2022 WL 279826, at \*4 (citing 15 U.S.C. §§ 77e(a), (c)); 15 U.S.C. § 77*l*(a)(1) (noting that "[a]ny person who . . . offers or sells a security in violation of section 77e of this title . . . shall be liable . . . to the person purchasing such a security from him, who may sue either at law or in equity . . . to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security"); *Direct Benefits, LLC v. TAC Fin., Inc.*, Civ. No. SAG-13-1185, 2020 WL 1890507, at \*9 (D. Md. Apr. 16, 2020) (noting that § 77*l*(a)(1) "provid[es] a buyer a private right of action against a seller who violates § 77e(a)(1)"). "If the [plaintiff] successfully proves these elements, the burden shifts to the defendant to demonstrate that an exception to the registration requirement applies." *Bennett*, 2022 WL 279826, at \*4 (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)).

The Court agrees that Plaintiffs have established the first and second elements to succeed on a Section 5 claim against CreditDap. First, CreditDap, which is a Delaware-based LLC, utilized means of interstate commerce when it contracted with Plaintiffs, who are all residents of Maryland, over the Internet. *See e.g.*, ECF 35-1,[6] at 5 ¶ 12 ("The Contracts largely were exchanged with Plaintiffs electronically and Plaintiffs also executed the Contracts electronically via DocuSign."); *see also Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1348 (S.D. Fla. 2019) (finding that using the Internet, including email, is enough to establish the instrumentality of interstate commerce

---

[6] Plaintiffs' declarations largely contain the exact same information with the same wording. For efficiency, the Court will cite only to Plaintiff Jing's "omnibus declaration." *See* ECF 35-1.

element); *SEC v. Perkins*, Civ. No. 19-243-FL, 2022 WL 4703335, at *13 (E.D.N.C. Sept. 30, 2022) (same).

Second, the complaint sufficiently alleges that Tenkiang, through CreditDap, directly offered to sell and did sell the contracts to Plaintiffs. Though Tenkiang's precise role in the companies beyond their formation is not clear, a person need not be an officer or director to fall within Section 5's scope. "A defendant is liable as a seller under Section 5 if he was a 'necessary participant' or 'substantial factor' in the illicit sale." *SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 939 (S.D. Ohio 2009) (citing *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004); *SEC v. Holschuh*, 694 F.2d 130, 139–40 (7th Cir. 1982)), *aff'd*, 712 F.3d 321 (6th Cir. 2013). "Thus, even if a defendant did not directly sell securities to investors himself or pass title, he is liable for registration violations if he 'has conceived of and planned the scheme by which the unregistered securities were offered or sold.'" *Id.* (quoting *SEC v. Friendly Power Co.*, 49 F. Supp. 2d 1363, 1371 (S.D. Fla. 1999)). Because Plaintiffs have pled and sufficiently stated in sworn declarations based on personal knowledge that Tenkiang and CreditDap directly sold the investment contracts to Plaintiffs, Plaintiffs have established the second element of a Section 5 claim against Tenkiang and CreditDap.

It is at the third element that Plaintiffs' claim fails. As a threshold matter, the Court agrees that the investment contracts entered into by each plaintiff with CreditDap are securities within the meaning of 15 U.S.C. §77b(a)(1). The Securities Act plainly defines "security" as including an "investment contract." 15 U.S.C. § 77b(a)(1). "A contract, transaction or scheme is an investment contract whenever a 'person [1] invests his money [2] in a common enterprise [3] and is led to expect profits solely from the efforts of the promoter or a third party . . . .'" *Bailey v. J.W.K. Properties, Inc.*, 904 F.2d 918, 920 (4th Cir. 1990) (alterations in original) (quoting *SEC v. W.J.*

*Howey Co.,* 328 U.S. 293, 298–99 (1946)). "A common enterprise exists where the fortunes of the investor are interwoven with and dependent upon the efforts and success of the party seeking the investment or of a third party." *Waterman v. Alta Verde Indus., Inc.*, 643 F. Supp. 797, 803 n.6 (E.D.N.C. 1986), *aff'd*, 833 F.2d 1006 (4th Cir. 1987).

Plaintiffs have established that they each contracted with CreditDap to invest money in a common enterprise from which they expected to profit from the efforts of CreditDap through HYSAs.[7] *See* ECF 1, at 12–16 ¶¶ 29–49, *see also, e.g.*, ECF 35-1, at 15 ("CreditDap LLC [a]grees [t]o pay George Jing, $67,291/month for 24 months starting December 25th, 2021. Should any issues arise with the platforms being used to earn yield, CreditDap will return George Jing his/her deposit of $850,000.00 in full within 30 days."). Plaintiffs expected to see returns in each of their HYSAs based solely upon the investment management of CreditDap. *See id.* Thus, each of the contracts signed by Plaintiffs is a security within the meaning of the Securities Act.

However, Plaintiffs have not sufficiently established that these securities were not registered with the SEC as required. The only facts upon which the Court can rely were it to find that Plaintiffs have met this element are conclusory statements made in the complaint and in declarations "upon information and belief." *See, e.g.*, ECF 35-1, at 5 ¶ 14 ("Upon information and belief, no registration statement has been filed as to these securities."). No Plaintiff (nor anyone else submitting a declaration or affidavit in support of the motion for default judgment) explains the basis for their "information and belief." No declarant attests to having conducted a search of, for example, the SEC's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system or otherwise inquired in the registration status of the investment contracts. *See* Search Filings, U.S.

---

[7] To be clear, though this case involves cryptocurrency, the securities at issue here are the investment contracts, not the "DAP" token.

Securities & Exchange Commission, available at https://www.sec.gov/search-filings (last visited Aug. 26, 2024); *see also* Protect Your Money: Ask and Check, Financial Industry Regulatory (FINRA), available at https://www.finra.org/investors/protect-your-money/ask-and-check (last visited Aug. 26, 2024) (explaining the ways to check whether an investment is registered with the SEC). Such statements, which are not based on the personal knowledge of the declarant, are not sufficient to prove liability for default judgment. *See Educ. Credit Mgmt. Corp. v. Optimum Welding*, 285 F.R.D. 371, 374 (D. Md. 2012) (denying a motion for default judgment where the only proof that the plaintiff had met an element of a claim was a statement made "upon information and belief"); *Brophy*, 771 F. Supp. 2d at 543 ("An allegation made 'on information and belief' does 'not serve as a reliable foundation upon which to predicate a final judgment.'" (quoting *Oceanic Trading Corp. v. Vessel Diana*, 423 F.2d 1, 4–5 (2d Cir. 1970))); *see also Weinreich v. Lamson*, 23 F. App'x 597, 598 (8th Cir. 2001) (holding that "the district court did not commit plain error by relying on the plaintiffs' affidavits [which] were grounded in personal knowledge and sufficient to support the district court's finding the summons was served").

Further, Plaintiffs have not established liability on this count for any of the additional Defendants beyond CreditDap and Tenkiang, either. Section 77*l* limits "the class of defendants who may be subject to liability as those who offer or sell unregistered securities." *Pinter v. Dahl*, 486 U.S. 622, 641–42 (1988) (footnote omitted). The complaint sufficiently alleges that CreditDap and Tenkiang offered or sold the securities, but it does not do so for the remaining Defendants. Plaintiffs allege broadly that all of the Defendants were involved in the scheme. *See, e.g.*, ECF 1, at 8–9 ¶ 18 ("[T]he Defendant Companies were used in tandem to market and promote the DAP token and HYSAs, along with other related products and services. Upon information and belief, Defendant Companies were formed to deceive investors and perpetuate the same fraudulent

investment scheme."), at 9 ¶ 21 ("Defendants acted as unregistered brokers in connection with their offers and sales of interests in HYSAs under the Contracts. They did so by actively and continuously soliciting investors and handling investor funds.").

However, nowhere do Plaintiffs explain each Company Defendant's specific involvement in the scheme, only Tenkiang's and CreditDap's. The motion for default judgment does not explain the specific basis for each Defendant's liability. Plaintiffs do allege in the complaint that "Mr. Tenkiang formed [DapLabs] to hold his purported proprietary DAP token and engage in specialized blockchain research." ECF 1, at 8 ¶ 16. But the DAP token is not actually the security that is the subject of this count—the investment contracts are. *See SEC v. Binance Holdings Ltd.*, Civ. No. 23-1599 (ABJ), ___ F. Supp. 3d ___, 2024 WL 3225974, at *10–11 (D.D.C. June 28, 2024) (differentiating between cryptocurrency tokens and investment contracts involving such tokens and explicitly declining to decide whether the crypto token at issue in that case met the definition of "security"). Plaintiffs allege that "[i]n or around May 2016, Mr. Tenkiang formed [OurBloc] for the purpose of securing investors in cryptocurrency and related blockchain products." ECF 1, at 8 ¶ 15. Beyond this allegation, however, OurBloc's role in the investment contracts is not clear.[8] The complaint contains no specific allegations as to BlocRealty,

---

[8] Some of Plaintiffs' contracts with CreditDap do specify that CreditDap is a subsidiary of OurBloc. *See* ECF 1-1, at 2; ECF 1-3, at 2; ECF 1-4, at 2; ECF 1-6, at 2; ECF 1-7, at 2; ECF 1-8, at 2; ECF 1-9, at 2; ECF 1-10, at 2; ECF 1-12, at 2; ECF 1-13, at 2; ECF 1-14, at 2; ECF 1-15, at 2; ECF 1-16, at 2; ECF 1-17, at 2; ECF 1-18, at 2. However, an entity's status as a parent company, without more, is not sufficient to impute liability as a seller under Section 5. To find a parent company liable, the Court would have to find the parent company meets the elements for control person liability under Section 20(a), 15 U.S.C. § 78t(a). *See SEC v. Coinbase, Inc.*, ___ F. Supp. 3d ___, No. 23 CIV. 4738 (KPF), 2024 WL 1304037, at *26 (S.D.N.Y. Mar. 27, 2024) (finding that the SEC had adequately pled a claim for control person liability against a parent company when the complaint contained allegations that the parent company managed and directed its wholly-owned subsidiary, including "directing and participating in the acts constituting [the subsidiary's] Exchange Act violations"). Plaintiffs here have made no argument that OurBloc should be liable as a control person.

BlocGroup, BlocMedia, or DapConcierge. In their declarations, Plaintiffs assert that "[u]pon information and belief, the Company Defendants largely were owned and controlled solely by Mr. Tenkiang. The Company Defendants were advertised and described collectively as the 'Conglomerate' and, upon information and belief, largely operated as a single entity." *See, e.g.,* ECF 35-1, at 3 ¶ 5. Plaintiffs further assert that "[u]pon information and belief, the monies invested by the Plaintiffs pursuant to the Contracts were commingled between and among the Company Defendants and generally misappropriated by Defendants and/or utilized in a manner not agreed to or authorized by Plaintiffs." *Id.* at 9 ¶ 24. Such conclusory statements, which are not based on personal knowledge but rather "information and belief," however, do not provide the Court sufficient basis from which to infer liability as to all the defendants for violation of Section 5 of the Securities Act.

For these reasons, default judgment will be denied as to count I.

### 2.    Count II: Breaches of Contract

Each of the contracts between Plaintiffs and CreditDap indicate that they are governed by Pennsylvania law. *See* ECF 1-1, at 6 (contract of A. Abanda); ECF 1-2, at 6 (contract of A. Bolima); ECF 1-3, at 6 (contract of Yadeta); ECF 1-4, at 6 (contract of Fohtung); ECF 1-5, at 6 (contract of Ntinglet); ECF 1-6, at 6 (contract of Jing); ECF 1-7, at 6 (contract of Mukong); ECF 1-8, at 6 (contract of Kaspa); ECF 1-9, at 6 (contract of Ndumu); ECF 1-10, at 6 (contract of Fube); ECF 1-11, at 6 (contract of N. Bolima); ECF 1-12, at 6 (contract of N. Bolima, Jr.); ECF 1-13, at 6 (contract of Kemvo); ECF 1-14, at 6 (contract of Michael); ECF 1-15, at 6 (contract of R. Abanda); ECF 1-16, at 6 (contract of Wolteji); ECF 1-17, at 6 (contract of Fobella); ECF 1-18, at 6 (contract of Zeh). Under Pennsylvania law, a breach of contract claim contains three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the

contract[,] and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

The Court notes that though most of the Plaintiffs have provided a signed copy of their contract, the contracts provided for A. Bolima and Ntinglet were only signed by the respective Plaintiff and are lacking the signatures of any Defendant. *See* ECF 35-3, at 10; ECF 35-6, at 10. The contract supplied by Mukong is not signed at all. *See* ECF 35-9, at 10. Further, Mwangi, Tamukong, and Oladitian no longer have copies of their contracts. *See* ECF 1, at 13 ¶ 35, at 14 ¶ 40, at 15 ¶ 44. Nevertheless, each declares that they entered into a contract with CreditDap and agreed to pay a specified amount in principal investment. *See* ECF 35-3, at 1 ¶ 3 (declaration of A. Bolima) ("On or about March 7, 2022, I entered into a contract with CreditDap . . . whereby I agreed to pay $100,000 for what was represented to me as a [HYSA]."); ECF 35-6, at 1 ¶ 3 (declaration of Ntinglet) ("On or about March 11, 2022, I entered into a contract with CreditDap . . . whereby I agreed to pay $150,000 for what was represented to me as a [HYSA]."); ECF 35-8, at 1 ¶ 3 (declaration of Mwangi) ("I entered into a contract with CreditDap . . . whereby I agreed to pay $126,000 for what was represented to me as a [HYSA]."); ECF 35-9, at 1 ¶ 3 (declaration of Mukong) ("On or about March 14, 2021, I entered into a contract with CreditDap . . . whereby I agreed to pay $40,000 for what was represented to me as a [HYSA]."); ECF 35-13, at 1 ¶ 3 (declaration of Tamukong) ("I entered into a contract with CreditDap . . . whereby I agreed to pay $50,000 for what was represented to me as a [HYSA]."); ECF 35-17, at 1 ¶ 3 (declaration of Oladitian) ("I entered into a contract with CreditDap . . . whereby I agreed to pay $83,000 for what was represented to me as a [HYSA]."). Such declarations, which are based on the personal knowledge of each Plaintiff, are a sufficient basis from which the Court can conclude that a contract existed between each Plaintiff and CreditDap as well as each contract's essential terms,

including the principal amount to be paid by the Plaintiff, the amount CreditDap promised to pay to the Plaintiff in monthly installments, and the duration of the contract. *See Educ. Credit Mgmt. Corp.*, 285 F.R.D. at 374; *Brophy,* 771 F. Supp. 2d at 543; *Oceanic Trading Corp.*, 423 F.2d at 4–5; *Weinreich,* 23 F. App'x at 598. Plaintiffs have therefore met the first element.

Plaintiffs have also established that CreditDap breached a duty owed to them under the contracts, resulting in damages. The contracts contemplate each Plaintiff paying CreditDap a principal amount in exchange for monthly payments of a specified amount over a specific period. *See, e.g.*, 35-1, at 13–17. For example, Jing's contract states:

> CreditDap LLC [a]grees [t]o pay George Jing[] $67,291/month for 24 months starting December 25th, 2021. Should any issues arise with the platforms being used to earn yield, CreditDap will return George Jing his/her deposit of $850,000.00 in full within 30 days. George Jing can withdraw his/her principal at any time before the 24-month period is over for a 15 percent penalty and forfeiture of profits. George Jing has the option of renewing his/her contract after the 24-month period is over. We reserve the right to decrease increase the interest rate based on market performance at the time of renewal. This will not be done without informing the client.

ECF 35-1, at 15. The contracts imposed a duty on CreditDap to pay the specified the monthly amount to each Plaintiff—$67,291 in Jing's case. Even the Plaintiffs without copies of their contracts state the specific principal they paid into the HYSA scheme and the yield still owed to them at the time of the termination. *See* ECF 35-8, at 1 ¶ 3 (Mwangi attesting to having paid $126,000); ECF 35-13, at 1 ¶ 3 (Tamukong attesting to having paid $50,000); ECF 35-17, at 1 ¶ 3 (Oladitian attesting to having paid $83,000). Plaintiffs each attest, and have provided a copy of the email sent to investors, that CreditDap stopped paying the monthly amounts promised and terminated the "High-Yield Savings program" on April 22, 2022. *See* ECF 35-1, at 10 ¶ 29 (declaration); ECF 35-2, at 12 (email). The email specified that CreditDap "will be returning the remaining of each depositor's account in a time frame suitable for business operations and our

former clientele" and that "all participants will have received the amount of money they've put into the program by the end of the year." ECF 35-2, at 12. The email further states that CreditDap would return only the principal amount each Plaintiff originally deposited minus any payments Plaintiffs had already received. *See id.* ("If you have been receiving periodic payments, these payments will count towards the amount of money you've put into the program. Meaning if you've put 100k into the program, and were paid monthly for 11 months, we will only give you the difference of your amount deposited and how much we paid you over 11 months."). Plaintiffs assert that they were not repaid the full principal amounts they originally deposited and that they were still owed yield payments. *See* ECF 1, at 18 ¶ 55. Because CreditDap never fulfilled its duty to complete payments to Plaintiffs under the contracts, Plaintiffs have satisfied the second element of a Pennsylvania breach of contract claim. Further, Plaintiffs have each detailed the specific amounts by which they were damaged both in the complaint and through their declarations. For example, Jing invested $850,000 in principal into the CreditDap HYSA investment contracts. *See* ECF 1, at 13 ¶ 34; ECF 35-1, at 8 ¶ 23.f. At the time of the termination email, he was owed $306,750 in yield under the contract. *See* ECF 1, at 20 ¶ 71. CreditDap returned $150,000 of principal to Jing, but Jing is still damaged in the amount of $1,006,750 ($700,000 of principal plus $306,750 owed in yield). *Id.* Plaintiffs have each provided similar calculations. *See id.* at 19–23 ¶¶ 66–86. Thus, Plaintiffs have established that CreditDap breached each of their contracts.

The Court now turns to the liability of Tenkiang and the remaining Company Defendants.[9] In the motion, Plaintiffs point to *Mortimer v. McCool*, 255 A.3d 261 (Pa. 2021), to support their

---

[9] The Court notes that it is not necessarily clear from the complaint that Plaintiffs have pled breach of contract against all Defendants. Nearly all the paragraphs relating to this count refer only to CreditDap. Only one paragraph extends the reach of the claim to the other Defendants by alleging that CreditDap

position that Tenkiang and the other Company Defendants, not just CreditDap, should be held liable because (1) Tenkiang used each in concert to perpetuate the scheme, (2) CreditDap "has indicated that it is insolvent and/or unable to pay Plaintiffs the amounts owed," and (3) "grave injustice and inequity will result" if Defendants are not held jointly and severally liable. *See* ECF 35, at 18 n.5. In *Mortimer*, the Supreme Court of Pennsylvania clarified that in determining whether piercing the corporate veil to establish enterprise liability for sister corporations, a court applying Pennsylvania law should apply a two-pronged test:

> First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and second, adherence to the corporate fiction under the circumstances would sanction fraud or promote injustice. . . .
>
> The second element . . . —that there be some fraud, wrong or injustice—seems to be nothing more than a restatement of the basic starting point that piercing is an equitable remedy used to prevent injustice. . . .

*Mortimer*, 255 A.3d at 286–87 (alterations in original) (quoting Franklin A. Gevurtz, *Piercing Piercing: An Attempt to Lift the Veil of Confusion Surrounding the Doctrine of Piercing the Corporate Veil*, 76 OR. L. REV. 853, 862 (1997)).

The Pennsylvania Supreme Court cautioned that "[a]s we held in *Great Oak Building & Loan*, piercing may occur only 'when the rights of innocent parties are not prejudiced thereby.'" *Mortimer*, 255 A.3d at 287 (quoting *Great Oak Bldg. & Loan Ass'n v. Rosenheim*, 19 A.2d 95, 97

---

was a mere instrumentality of Mr. Tenkiang and the other Defendant Companies, formed for the sole purpose of perpetuating a fraudulent investment scheme upon Plaintiffs and other investors. Upon information and belief, the monies invested pursuant to the Contracts were commingled between and amongst Defendant Companies and misappropriated by Mr. Tenkiang for his personal use.

ECF 1, at 23 ¶ 87. As relief for count II, Plaintiffs seek "judgment be entered in their favor against Defendants." *Id.* at 32. From this context, the Court gathers that Plaintiffs intended to bring count II against all Defendants.

(Pa. 1941)). The *Mortimer* court ultimately declined to extend "triangular piercing" to a sister corporation and the individual owners of the corporation because there was not substantially common ownership of the sister corporation and because the trial court had found the owners had maintained a sufficient separation between their personal assets and the assets of the breaching corporation. *Id.* at 287. As the Third Circuit has recognized, "Pennsylvania law, applicable here, recognizes a strong presumption against piercing the corporate veil." *Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 576 (3d Cir. 2018) (quoting *In re Blatstein*, 192 F.3d 88, 100 (3d Cir. 1999)). Courts applying Pennsylvania law may find that piercing the corporate veil is warranted based on the presence of at least some of the following factors:

> failure to observe corporate formalities, non-payment of dividends, insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant shareholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Kaplan v. First Options of Chi., Inc.*, 19 F.3d 1503, 1521 (3d Cir. 1994) (quoting *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981), and *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686–87 (4th Cir. 1976)); *see also Mortimer,* 255 A.3d at 278 (citing *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995)) (endorsing application of these factors); *Ashley v. Ashley*, 393 A.2d 637, 641 (Pa. 1978) (holding that the corporate form may be disregarded "whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests").

As an initial matter, Armel Tenkiang, the only individual defendant to this suit, did not sign the contracts as an agent of CreditDap or otherwise. Indeed, his precise role in CreditDap and the Company Defendants, beyond forming the companies, is not entirely clear from the complaint. The contracts of fifteen Plaintiffs (Jing, A. Abanda, Yadeta, Fohtung, Kaspa, Ndumu, Fube, N.

Bolima, N. Bolima, Jr., Kemvo, Michael, R. Abanda, Wolteji, Fobella, and Zeh) were signed by the respective Plaintiff as well as a "Lisa Jing," who is purportedly the Chief Executive Officer of CreditDap, and Chiason Tenkiang, who is purportedly the Chief Financial Officer of CreditDap— not Armel Tenkiang.[10] *See* ECF 35-1, at 17; ECF 35-2, at 10; ECF 35-4, at 10; ECF 35-5, at 10; 35-10, at 10; ECF 35-11, at 10; ECF 35-12, at 10; ECF 35-14, at 10; ECF 35-15, at 11; ECF 35-16, at 8; ECF 35-18, at 10; ECF 35-19, at 10; ECF 35-20, at 10; ECF 35-21, at 10; ECF 35-22, at 10.

Plaintiffs include in the complaint a screenshot of a text message from Armel Tenkiang on September 21, 2021.[11]  In response to concern about "conserv[ing] some money" and "cut[ting] down on the spending and trips" which "have cost[] a whole lot on the company," Tenkiang curses at the sender, says "[y]our opinion is invalid," and proclaims "[t]he money is mine [I] can do what [I] want." ECF 1, at 11 ¶ 25. This conversation corroborates the statements by Plaintiffs in their declarations that Tenkiang misused their investment funds for his own personal use. *See, e.g.*, ECF 35-1, at 6–7 ¶¶ 18, 21. Nevertheless, the Court is unable to find that the other factors favoring piercing the corporate veil are present here—the complaint contains no allegations regarding corporate formalities, the role and/or functioning of other officers or directors, or the existence of corporate records.  On such a bare record, with the presumption against piercing the corporate veil in mind, and because the Court will grant default judgment against Tenkiang on the unjust

---

[10] Whether there is any relationship between George Jing and Lisa Jing and Armel Tenkiang and Chiason Tenkiang goes unexplained in the complaint.  Neither Lisa Jing nor Chiason Tenkiang are parties to this suit.

[11] The conversation partner with Tenkiang in this text exchange is unclear.  The complaint suggests that it is a member of "[Tenkiang's] own staff." ECF 1, at 10 ¶ 25. A message seemingly sent by Tenkiang refers the recipient as "Chase." *Id.* at 11 ¶ 25.

enrichment claim, the Court declines to pierce the corporate veil as to Tenkiang and find that he has breached the contracts each Plaintiff entered into with CreditDap.

Nor will the Court enter default judgment against the remaining Company Defendants on the breach of contract count because Plaintiffs have not established that the remaining Defendants are also liable for breach of contract. Though the complaint and declarations summarily assert that the other LLCs were involved in the scheme, the allegations are not specific enough to point to each of the other LLC's culpability. Nor is it clear that there is substantially common ownership of each Company Defendant and CreditDap to warrant triangular piercing under *Mortimer*. The Court, therefore, declines to enter default judgment against the remaining Company Defendants.

For these reasons, default judgment is granted in favor of Plaintiffs against only CreditDap on count II (breach of contract).

3.    Count III: Unjust Enrichment (Pled in the Alternative to Count II)

Plaintiffs pled count III in the alternative to count II. Because the Court grants default judgment on count II as to CreditDap, the Court need not address count III as it relates to it. *See Roman Mosaic & Tile Co., Inc. v. Vollrath*, 313 A.2d 305, 307 (Pa. Super. 1973) ("The doctrine of unjust enrichment is clearly inapplicable when the relationship between the parties is founded on a written agreement or express contract." (citations and quotation marks omitted)); *see also Telwell Inc. v. Grandbridge Real Estate Capital, LLC*, 143 A.3d 421, 428 (Pa. Super. 2016). "An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law." *Discover Bank v. Stucka*, 33 A.3d 82, 88 (2011) (quoting *Sevast v. Kakouras,* 915 A.2d 1147, 1153 n.7 (2007)). A claim for unjust enrichment includes the following elements:

benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances

that it would be inequitable for defendant to retain the benefit without payment of value. Whether the doctrine applies depends on the unique factual circumstances of each case. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

Moreover, the most significant element of the doctrine is whether the enrichment of the defendant is *unjust*. The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff.

*Stoeckinger v. Presidential Fin. Corp. of Delaware Valley*, 948 A.2d 828, 833 (Pa. Super. 2008) (quoting *Styer v. Hugo,* 619 A.2d 347, 350 (Pa. Super. 1993)).

As against Tenkiang, Plaintiffs here have sufficiently established that Plaintiffs conferred a benefit on him when they purported to invest in the HYSAs, that he accepted and retained such a benefit, and that it would be inequitable for him to retain that benefit without repaying the value. As explained above, Tenkiang asserts in a text message with an employee that "[t]he money is mine [I] can do what [I] want." ECF 1, at 11 ¶ 25. Plaintiffs have also sufficiently corroborated the fact that Tenkiang has appreciated and retained the cash for his own personal use in their declarations. *See, e.g.*, ECF 35-1, at 6–7 ¶ 18 ("Upon receipt by the Defendants, the funds invested by Plaintiffs then were diverted, commingled, and used for improper purposes, including to pay yields to earlier investors, with substantial amounts misappropriated by Mr. Tenkiang for personal use and to fund other unrelated investments and businesses."), at 7 ¶ 21 ("Mr. Tenkiang lived and, upon information and belief, is living an opulent and lavish lifestyle funded by monies fraudulently obtained from Plaintiffs. In a publicly-available video published on YouTube, Mr. Tenkiang can be seen washing his hands with champagne and inviting his guests to do the same.").

However, the same cannot be said, at least on the current record and allegation in the complaint, for the remaining Company Defendants. Plaintiffs' allegations that the money invested in the CreditDap HYSAs was commingled with the remaining Defendants' assets are conclusory.

Further, the same considerations of fairness are not necessarily apparent to the Court with respect

to these Defendants. While it is clear to the Court that permitting Tenkiang to remain unscathed,

based on the undisputed allegations in the complaint, would be unjust, the same cannot be said for

the Company Defendants. Though it may be true that the Company Defendants received some

benefit through commingled funds, the allegations in the complaint as to the Company Defendants

are conclusory and speculative as to each of their roles in the scheme. As such, the Court will not

grant default judgment against the Company Defendants.

For these reasons, default judgment is entered in favor of Plaintiffs against Tenkiang only

as to the unjust enrichment claim.

### 4. Count IV: Securities Fraud

Count IV of the complaint alleges violations of securities fraud, including violations of

Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and of Rule 10b–5.

*See* ECF 1, at 30–31 ¶¶ 124–29. Section 10(b) prohibits the use of "any manipulative or deceptive

device or contrivance" if employed "in connection with the purchase or sale of any security." 15

U.S.C. § 78j(a)(1) and (b). "SEC Rule 10b-5 implements this provision by making it unlawful to,

among other things, 'make any untrue statement of a material fact or to omit to state a material

fact necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38

(2011) (quoting 17 CFR § 240.10b–5(b)). "Deceptive acts include misstatements, omissions by

those with a duty to disclose, manipulative trading practices, and deceptive courses of conduct."

*SEC v. Pirate Inv. LLC*, 580 F.3d 233, 240 (4th Cir. 2009) (citing *Stoneridge Inv. Partners, LLC

v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 158 (2008)). A claim for violation of Section 10(b) of the

Exchange Act and Rule 10b–5 includes the following elements: "(1) a material misrepresentation

or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018) (quoting *Stoneridge Inv. Partners, LLC*, 552 U.S. at 157).

Claims of violations of section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder are subject to the heightened pleading requirements established by the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u–4(b); *see also Stoneridge Inv. Partners, LLC*, 552 U.S. at 165 (noting that the PSLRA "imposed heightened pleading requirements and a loss causation requirement" on private actions "arising from the [ ] Exchange Act."). Rule 9(b) requires that a party alleging "fraud or mistake" is required to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Additionally, the PSLRA requires that, when a complaint alleges that a defendant is liable for making an untrue statement of material fact, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4 (b)(1)(A). "The heightened Rule 9(b) pleading standard applies even in the default judgment context." *See James v. Delta Motors, LLC*, 672 F. Supp. 3d 155, 163 (W.D. Va. 2023) (citing *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392–93 (9th Cir. 1988); *Glaser v. Hagen*, No. 114CV1726LMBIDD, 2016 WL 521454, at *2 (E.D. Va. Feb. 5, 2016)); *see also Williams v. Dee Miracle Auto Grp. LLC*, Civ. No. ELH-15-2466, 2016 WL 3411640, at *4 (D. Md. June 22, 2016) (Gesner, M.J.), *report and recommendation adopted* (D. Md. July 17, 2016).

Further, the PSLRA imposes a heightened pleading standard on the scienter element in particular: "the complaint shall, with respect to each act or omission alleged . . ., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007). "To the extent a plaintiff alleges corporate fraud, the plaintiff 'must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation.'" *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182 (4th Cir. 2009) (quoting *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007)).

Plaintiffs have not sufficiently pled a claim for securities fraud under Section 10(b) or Rule 10b–5, so default judgment is not warranted on this count. Plaintiffs argue that "[t]he Defendants knowingly made these false statements to Plaintiffs concerning the propriety, security, financial wherewithal of CreditDap LLC, the use of the proceeds Plaintiffs were to deposit and/or invest, and the guarantees of principal repayment for purposes of deceiving, manipulating, and defrauding Plaintiffs and fraudulently inducing Plaintiffs to sign the Contracts and deposit and invest their funds in Defendants' HYSAs." ECF 35, at 30. In the complaint, Plaintiffs allege broadly that "Defendants employed false, deceptive, and manipulative representations and actions for the purpose of and with the intent of inducing Plaintiffs to rely on the same and invest their funds in the HYSAs." ECF 1, at 30 ¶ 125. Plaintiffs aver that "[t]he false, deceptive, and manipulative representations and actions of the Defendants included, but are not limited to the making of knowingly false statements to Plaintiffs concerning the financial wherewithal of CREDITAPP,[12] the making of knowingly false statements to Plaintiffs in connection with the use of the proceeds

---

[12] "CreditApp" is not mentioned elsewhere in the complaint. The Court assumes that it is a typographical error and is supposed to read "CreditDap."

Plaintiffs were to invest, and the guarantees of principal repayment." *Id.* ¶ 126. Earlier in the complaint, which Plaintiff incorporates by reference to count IV, *see id.* ¶ 124, Plaintiffs allege that newsletters published by Tenkiang under the names of the Defendant Companies included false representations. *Id.* at 10 ¶¶ 23, 24. However, Plaintiffs never point to a specific false representation in the newsletters.

These allegations are not made with the requisite particularity to state a claim for fraud under either Rule 9(b) or under the PSLRA as to any of the Defendants, and certainly not to the Company Defendants. Plaintiffs do not point to any specific false statement in the newsletters (or elsewhere), allege when the newsletters were published, or attribute the newsletters to any specific Company Defendant. Rather, Plaintiffs allege that the newsletters "purported to provide both potential and existing investors with information and updates on the cryptocurrency market and strategic investment opportunities. These newsletters included statements such as 'when the market bleeds, we win; when the market wins, we win,' alongside contact information for anyone interested in learning more." *Id.* ¶ 23. These statements fall within the realm of puffery that do not form a basis of a securities fraud claim under Section 10(b). *See Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 522 (D. Md. 2022) ("Puffery is defined as 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" (quoting *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 766–67 (E.D. Va. 2004))). Plaintiffs have not pointed to any other specific false statements made in the newsletters. Further, Plaintiffs do not state with particularity (or at all) the facts from which they derived any of the assertions made upon information and belief. Nor can the Court infer corporate scienter because Plaintiffs have not pled that Tenkiang is an authorized agent of any of the Defendant Companies.

In their Motion, Plaintiffs point to the omnibus declaration of Jing. *See* ECF 35, at 30. This declaration does include one particular instance where a representative of a Corporate Defendant allegedly made a fraudulent statement. Jing proclaims that "on November 4, 2020, a representative of the Company Defendants and wife of Mr. Tenkiang, Erika Tenkiang, via WhatsApp messenger, represented to investors and potential investors regarding the HYSAs, in pertinent part: 'You won't find a better product for saving on the market. A secure savings account that pays you monthly, or yearly. Your funds are backed 100 percent by Bitcoin/ethereum held by [O]urbloc.'" ECF 35-1, at 4 ¶ 11. This singular specific statement made only in a declaration attached to the motion for default judgment, however, does not cure the deficiency in the complaint Erika Tenkiang, the alleged maker of the statement, is not a party to this suit, is not named anywhere in the complaint, and her role in the Defendant Companies is not otherwise clear. Nowhere else in the declarations or motion for default judgment is Erika Tenkiang mentioned. In order to find liability on this count on the basis of this statement alone, assuming the statement is a material misrepresentation, the Court would need find that Erika Tenkiang is an authorized agent of the Company Defendants and impute her statement to all the Company Defendants and to Armel Tenkiang. The heightened pleading standard does not permit the Court to do so, so the motion for default judgment must be denied as to this count.

Because Plaintiffs have not pled facts with sufficient particularity to meet the heightened pleading standards that apply to Section 10(b) and Rule 10b–5 claims, default judgment is not warranted on this count.

5.    Count V: Fraud in the Inducement

Plaintiffs also bring a claim for fraud in the inducement. "[A] claim for fraudulent inducement under Pennsylvania law" includes:

(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Seguro Medico, LLC v. Humphreys*, 313 A.3d 298, 312 (Pa. Commw. Ct. 2024) (quoting *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179 (Pa. Super. 2005)), *reargument denied* (Feb. 1, 2024). As opposed to the PSLRA's heightened pleading standard for the scienter element of a securities fraud claim, Fed. R. Civ. P. 9(b) permits scienter to be alleged generally. *See Tellabs, Inc.*, 551 U.S. at 319–20. Nevertheless, Plaintiffs' fraud in the inducement claim fails for the same reason count IV does. Plaintiffs have not pled facts specific enough to meet the heightened pleading requirements of Rule 9(b). Plaintiffs argue that "Mr. Tenkiang, individually and on behalf of the Company Defendants, []as well as agents and employees of the Company Defendants, falsely represented to Plaintiffs that the Contracts were guaranteed to provide the promised returns." ECF 35, at 1. This argument is unavailing, however, because "[i]t is well-established that the breach of a promise to do something in the future is not actionable in fraud." *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pennsylvania*, 7 A.3d 278, 290 (Pa. Super. 2010) (quoting *Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1006 (Pa. Super. 1997)). Thus, Plaintiffs have failed to plead a fraud in the inducement claim, and default judgment is not warranted on this count.

B.   **Damages**

Plaintiffs' requested damages do not differ in kind or exceed that which was requested in the complaint. As such, the Court may enter default judgment in the amounts requested on the counts where Plaintiffs have established liability. *See* Fed. R. Civ. P. 54(c); *Monge*, 751 F. Supp. 2d at 794–800; *In re Genesys Data Techs., Inc.*, 204 F.3d at 132. Judgment will be entered in

favor of Plaintiffs and against CreditDap as to count II (breach of contract) and against Tenkiang as to count III (unjust enrichment) of the complaint. CreditDap and Tenkiang are jointly and severally liable in the amount of $1,125,618, and CreditDap is liable in the additional amount of $1,362,744 (making CreditDap liable for a total amount of $2,488,351), plus prejudgment interest at the judgment rate from April 22, 2022, and costs and attorneys' fees,[13] and post-judgment interest thereon from the date of the accompanying order. The breakdown of damages owed to each individual Plaintiff will be described in the accompanying order.[14]

## IV.   CONCLUSION

For the foregoing reasons, the motion for default judgment is granted in part and denied in part. Default judgment is entered in favor of Plaintiffs against CreditDap as to count II (breach of contract). and against Tenkiang as to count III (unjust enrichment). The motion is denied as to all other defendants and all other counts without prejudice.

A separate implementing Order will issue.

Dated: August 29, 2024

_____/s/_____
Brendan A. Hurson
United States District Judge

---

[13] The contracts each include a provision allowing for recovery of attorneys' fees and costs by the prevailing party. *See* ECF 1-1, at 5; ECF 1-2, at 4; ECF 1-3, at 4; ECF 1-4, at 4; ECF 1-5, at 4; ECF 1-6, at 4; ECF 1-7, at 4; ECF 1-8, at 4; ECF 1-9, at 5; ECF 1-10, at 5; ECF 1-11, at 4; ECF 1-12, at 4; ECF 1-13, at 4; ECF 1-14, at 5; ECF 1-15, at 4; ECF 1-16, at 5 ;ECF 1-17, at 4; ECF 1-18, at 5.

[14] Because Tenkiang is not liable for the yield amounts owed to each Plaintiff at the time of the Termination, he and CreditDap are liable, jointly and severally, only for the amounts specified under count III. To calculate the additional amounts for which CreditDap is liable under count II, the Court subtracted the amounts sought under count III from those sought under count II. Stated differently, CreditDap is liable for the full amounts sought as to count II, but Tenkiang is *also* liable, jointly and severally, for the subset of that amount sought under count III.