**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| ALVINE ABANDA ET AL., | * |
| Plaintiffs, | * |
|  | * |
| v. | * |
|  | * |
| OURBLOC LLC ET AL., | * |
|  | * |
| Defendants. | * |
|  | * |

Civil No. 23-1071-BAH

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Currently pending before the Court in this matter is Defendant Armel Tenkiang's motion to vacate the Court's order of default judgment, entered at ECF 37. ECF 39.[1] Plaintiffs filed a response in opposition, ECF 46, and Tenkiang filed a reply, ECF 49. Additionally, Plaintiffs have filed a motion for attorney fees, ECF 38, to which no response was filed. All filings include memoranda of law and exhibits.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Plaintiffs' motion for attorneys' fees, ECF 38, is GRANTED in part and DENIED in part, and Tenkiang's motion to vacate the order of default judgment, ECF 39, is DENIED.

---

[1] The docket reflects two pending motions to vacate the default judgment, ECF 39 and ECF 40. However, ECF 39 appears to be the motion itself, while ECF 40 seems to be the memorandum in support of the motion, filed separately. Both initially seek reconsideration of the Court's entry of default under Federal Rule Civil Procedure 55 and allege that mere "good cause" is required for Tenkiang to prevail. *See* ECF 39, at 1 (the motion); ECF 40, at 2 (memorandum in support). However, Tenkiang later references the proper rule for situations where, as here, default *judgment* has previously been entered. ECF 40, at 4 (citing Fed. R. Civ. P. 60(b)(1)); *see also* Fed. R. Civ. P. 55(c) (holding that a court "may set aside a final default judgment under Rule 60(b)").

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

## I.    BACKGROUND

### A.    Factual Background

The underlying facts of this action were set out at length in the Court's August 29, 2024 memorandum opinion, *see* ECF 36, and thus the Court will repeat them here only briefly.

Plaintiffs filed the complaint on April 20, 2023, alleging violations of "securities laws" (count I), breaches of contracts (count II), unjust enrichment (count III) (pled in the alternative to count II), securities fraud (count IV), and fraud in the inducement (count V). *See* ECF 1. The complaint alleges that Tenkiang "perpetrated [an investment] scheme by offering investors the opportunity to invest in purported proprietary cryptocurrency tokens and High Yield Savings Accounts ('HYSAs')." *Id.* at 5 ¶ 1. Plaintiffs allege that "the cryptocurrency tokens and HYSA investment contracts were [actually] unregistered securities sold in violation of the Securities Act, and the funds claimed to be invested were in fact commingled and used to pay returns to earlier investors with substantial amounts misappropriated for Mr. Tenkiang's personal use." *Id.*

Plaintiffs allege that Tenkiang created the Company Defendants[3] in order to perpetrate the scheme. *See* ECF 1, at 7–8 ¶¶ 14–15. DapLabs, CreditDap, and BlocGroup are all subsidiaries of OurBloc, and CreditDap is also a subsidiary of DapLabs. *Id.* ¶¶ 5–7. BlocRealty is a subsidiary of both CreditDap and BlocGroup. *Id.* at 6 ¶ 8. DapConcierge is a subsidiary of BlocMedia, which is a subsidiary of CreditDap. *Id.* ¶¶ 9–10. Per Plaintiffs, "Tenkiang formed [CreditDap] to promote and run operations related to [a] HYSA product," in which "investors were encouraged to deposit funds in exchange for a high yield, and guaranteed return, in full, of their principal investment at the end of the contract." *Id.* at 8 ¶¶ 17–18.

---

[3] The Company Defendants are: OurBloc LLC ("OurBloc"), CreditDap LLC ("CreditDap"), DapLabs LLC ("DapLabs"), BlocRealty LLC ("BlocRealty"), BlocGroup LLC ("BlocGroup"), BlocMedia LLC ("BlocMedia"), and DapConcierge LLC ("DapConcierge").

Each of the Plaintiffs contracted with CreditDap between March 2021 and March 2022, each investing between $10,000 and $850,000 into a HYSA for a specified period of months and expecting to reap a high return yield.[4]  *See* ECF 1, at 12–16 ¶¶ 29–49.  Each of the individual contracts included a provision that specified:

> Should any issues arise with the platforms being used to earn yield, CreditDap LLC will return [investor name] his/her deposit in full. [Investor] can withdraw his/her principal at any time before the [] month period is over for a 15 percent penalty and forfeiture of profits accrued during the last 12 months.

*Id.* at 16 ¶ 50 (alterations in complaint).  After Plaintiffs "fully performed under each of the Contracts by depositing the agreed upon funds with [CreditDap]," CreditDap "paid some yield amounts out to Plaintiffs under their respective contracts, but failed to pay the full amount guaranteed."  *Id.* at 17 ¶¶ 51–52.  Despite paying some yields, in April 2022, CreditDap "communicated to investors that it was experiencing difficulties and would be returning to each investor the respective principal amounts invested in the HYSAs" and informed investors via email that "it was terminating the HYSA program (the 'Termination')."  *Id.* ¶¶ 53–54; *see also* ECF 1-19.

Plaintiffs allege that the money they purportedly invested in the HYSA program was "diverted, commingled, and used for other purposes including to pay yields to earlier investors, with substantial amounts misappropriated by [ ] Tenkiang for personal use and to fund other unrelated investments and businesses."  ECF 1, at 10 ¶ 24.  Plaintiffs further allege that in a text message conversation with a staff member who expressed concern about "conserve[ing] some money" and "cut[ting] down on the spending and trips," Tenkiang responded that "[t]he money is

---

[4] Attached to the complaint are copies of each of the contracts Plaintiffs entered into with CreditDap, except for Mwangi's, Tamukong's and Oladitian's.  *See* ECFs 1-1 through 1-18; *see also* ECF 1, at 13 ¶ 35 (explaining that "Ms. Mwangi no longer has a copy of her contract with [CreditDap]"); *id.* at 14 ¶ 40 (same regarding Tamukong); *id.* at 15 ¶ 44 (same regarding Oladitian).

mine [I] can do what [I] want." *Id.* at 10–11 ¶ 25. Some Plaintiffs have been partially reimbursed their principal investments, but no Plaintiff has been repaid in full. *Id.*, at 18 ¶ 55.

### B. Procedural History

After Plaintiffs filed their complaint, the Company Defendants were served.[5] After each failed to respond to the complaint and upon motion, the Clerk entered default against each. *See* ECF 11. The record reflects that Tenkiang was also served on May 31, 2023 at an address in Bear, Delaware. *See* ECF 20. When Tenkiang failed to respond, Plaintiffs moved for entry of default against him, *see* ECF 24, with the Clerk entering the default on June 26, 2023, *see* ECF 26.

Thereafter, mail sent to Tenkiang at the Bear, Delaware address listed on the complaint, *see* ECF 1, at 4, was returned as undeliverable. *See* ECF 29. Plaintiffs' counsel filed a notice indicating that the return label with the notation "no such street" was incorrect, and that Tenkiang lived at that address. *See* ECF 30. However, subsequent mail sent to Tenkiang at the Bear, Delaware address was again returned undeliverable. *See* ECF 32. The Court directed Plaintiffs to file a status report as to Tenkiang's address, as the notice of default had yet to be served on Tenkiang. *See* ECF 33. In this status report, Plaintiffs contended that Tenkiang's address was correct but that they had "reason to believe, based on reports from the investigators, that [ ] Tenkiang's relatives, who also reside at the address provided, are inaccurately claiming that he is not residing there and are rejecting mail about this case directed to him." ECF 34, at 2.

On October 18, 2023, this case was transferred to the undersigned. Subsequently, Plaintiffs filed a motion for default judgment as to all Defendants. ECF 35. On August 29, 2024, the Court granted in part and denied in part Plaintiffs' motion for default judgment. The Court granted

---

[5] *See* ECF 3 (service on OurBloc LLC), ECF 4 (service on CreditDap), ECF 5 (service on DapLabs), ECF 6 (service on BlocRealty), ECF 7 (service on BlocGroup), ECF 8 (service on BlocMedia), ECF 9 (service on DapConcierge).

Plaintiffs' motion for default judgment solely against CreditDap as to Plaintiffs' breach of contract claim (count II of the complaint) and against Defendant Tenkiang as to Plaintiffs' unjust enrichment claim (count III of the complaint). ECF 36, at 29. The Court entered judgment in favor of Plaintiffs "against CreditDap LLC as to count II (breach of contract) and against [ ] Tenkiang as to count III (unjust enrichment), jointly and severally, in the amount of $1,125,618, and against CreditDap LLC in the additional amount of $1,362,7[33],"[6] resulting in a total judgment of $2,488,351. ECF 37, at 1, 5.

Following the Court's order, Plaintiffs filed a motion for attorneys' fees on September 12, 2024. ECF 38. A few weeks later, on September 24, 2024, Tenkiang filed a motion to vacate the default judgment against him, ECF 39, along with a memorandum in support, ECF 40. Both motions are ripe for review.

## II.    **LEGAL STANDARD**

Rule 55(c) of the Federal Rules of Civil Procedure provides that a court "may set aside a final default judgment under Rule 60(b)." Under Rule 60(b), a party may be afforded relief from a judgment or order for reasons of (1) mistake, inadvertence, surprise, or excusable neglect, (2) newly discovered evidence that could not have previously been reasonably discovered, (3) fraud, (4) a void judgment, (5) satisfaction, release, or discharge of the judgment, or (6) any other reason that would justify relief. In order to obtain relief from judgment under Rule 60(b), the United States Court of Appeals for the Fourth Circuit has held that a moving party must show that the motion is timely, that the moving party has a meritorious defense to the underlying claims, and

---

[6] In the order of default judgment, the calculation for the total judgment of $2,488,351 and the judgment against Tenkiang of $1,125,618 were noted correctly. However, in addition to the $1,125,618 for which Tenkiang and CreditDap are jointly and severally liable, CreditDap is liable for an additional $1,362,733 rather than $1,362,744. The Court uses the correct figure of $1,362,733 here.

that the opposing party will not suffer unfair prejudice if the judgment is set aside. *United States v. Welsh*, 879 F.3d 530, 533 (4th Cir. 2018). In addition, the party must "satisfy one of the six enumerated grounds for relief under Rule 60(b)." *Id.*

Although the Fourth Circuit has announced a "strong policy" in favor of deciding cases on their merits, *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993), default judgment may be appropriate when a party has been unresponsive. *See S.E.C. v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). Moreover, "the 'disposition of motions made under Rules 55(c) and 60(b) is a matter which lies largely within the discretion of a trial judge[.]'" *Fed. Trade Comm'n v. Pukke*, 53 F.4th 80, 106 (4th Cir. 2022) (quoting *Consol. Masonry & Fireproofing, Inc. v. Wagman Constr. Corp.*, 383 F.2d 249, 251 (4th Cir. 1967)).

Though analyzed "using the same factors," a Rule 55(c) motion to set aside entry of *default* "is not the same" as a motion under Rule 60(b) for relief from *default judgment*. *Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 420 (4th Cir. 2010). "A somewhat more lenient standard is applied to Rule 55(c) motions than to Rule 60(b) motions." *Life Ins. Co. of N. Am. v. Monroe*, 236 F.R.D. 255, 256 (D. Md. 2006) (citing *Wainwright's Vacations, LLC v. Pan Am. Airways Corp.*, 130 F. Supp. 2d 712, 717–18 (D. Md. 2001)). "Rule 60(b) motions request relief from judgment, which implicates an interest in 'finality and repose,' a situation that is not present when default has been entered under Rule 55(a) and no judgment has been rendered." *Colleton Preparatory Acad.*, 616 F.3d at 420 (citation omitted). "Therefore, while an analysis under each rule employs similar factors, Rule 60(b)'s 'excusable neglect' standard is a more onerous standard than Rule 55(c)'s 'good cause' standard, which is more forgiving of defaulting parties because it does not implicate any interest in finality." *Id.*

6

## III.   ANALYSIS

### A.    Motion to Set Aside Default Judgment

1. Tenkiang has not satisfied the Fourth Circuit's requirements for vacating a default judgment.

Examining the filings and available record, the Court finds that Tenkiang has not met the necessary requirements to set aside the default judgment. As noted, "[t]o obtain relief from a judgment under Rule 60(b), a moving party must first show (1) that the motion is timely, (2) that he has a meritorious claim or defense, and (3) that the opposing party will not suffer unfair prejudice if the judgment is set aside." *Welsh*, 879 F. 3d at 533 (citing *Nat'l Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 264 (4th Cir. 1993)).

With respect to the first factor, timeliness, there is no credible challenge to the contention that Tenkiang responded to the default judgment with the requisite promptness as he filed the instant motion on September 24, 2024, *see* ECF 39, within a month of when the judgment was entered on August 29, 2024, *see* ECF 37.[7]

Turning to the second factor, the Court finds it likely that unfair prejudice would visit upon Plaintiffs if the Court were to vacate the default judgment, but declines to completely address the issue given the absence of a meritorious defense.[8]   Plaintiffs themselves argue that they have already expended significant resources in obtaining a favorable judgment and further note that Tenkiang's failure to appear meant they were denied an opportunity for "necessary discovery to

---

[7] The timeliness of a Rule 60(b) motion is evaluated pursuant to Rule 60(c)(1). *Felipe Gonzalez v. Mogotillo Rest., LLC*, Civ. No. 21-2063-TDC, 2023 WL 5608431 (D. Md. Aug. 30, 2023). Rule 60(c)(1) does not strictly define what constitutes a "reasonable time" for filing, though it does bar motions brought over a year after the default judgment, and so the timeliness of a motion must be evaluated according to the particular circumstances of a case. *Id.*

[8] The Court notes that the Fourth Circuit has treated the prejudice factor as important though not controlling in deciding a Rule 60(b) motion to vacate a default judgment. *Nat'l Credit Union*, 1 F.3d at 265 (citing *Compton v. Alton S.S. Co.*, 608 F.2d 96, 102 (4th Cir. 1979)).

obtain documents and evidence that would prove the other [D]efendants' liability to Plaintiffs." ECF 46, at 11. As a result, Plaintiffs say, they "were unable to utilize such documents and evidence in support" of their motion for default judgment against the remaining Defendants, apart from Tenkiang and CreditDap. *Id.* While unfair prejudice does not result from the mere expenditure of time and money, *see, e.g., Nat'l Liab. & Fire Ins. Co. v. Rooding*, Civ. No. 15-2572-ELH, 2016 WL 5144493, at *8–*9 (D. Md. Sept. 21, 2016), a defaulting party's delay can be unfairly prejudicial where it results in the loss of evidence or creates substantial discovery difficulties, *see, e.g., United States v. Britton-Harr*, 23-1921-ELH, 2024 WL 4434861, at *13 (D. Md. Oct. 7, 2024) (citing *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983)). Moreover, delays in production of discovery are undoubtedly prejudicial where they lead to loss of evidence. *See id.* at *14. Similarly, prejudice can also arise from unnecessary and avoidable delays that "hinder the opposing party's ability to develop their case." *Paice, LLC v. Hyundai Motor Co.*, Civ. No. 12-499-WDQ, 2014 WL 3819204, at *17 (D. Md. 2014). This is precisely the prejudice Plaintiffs allege here. ECF 46, at 11. Tenkiang responds only with the unsupported claim that Plaintiffs "have had ample time to gather evidence and can proceed with their case properly," ECF 49, at 5, a curious position given that Tenkiang, and the entities he allegedly "owned and controlled," ECF 46, at 11, failed to participate in the litigation. Though the record supports a finding that Plaintiffs have suffered unfair prejudice, the Court need not conclusively resolve this question since Tenkiang fails to demonstrate that he has a meritorious defense and thus fails to satisfy the third factor.

"A meritorious defense requires a *proffer of evidence* which would permit a finding for the defaulting party or which would establish a valid counterclaim." *Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir. 1988) (internal citation omitted)

(emphasis added); *see also Timilon Corp. v. Empowerment Just. Ctr. Corp.*, 738 F. Supp. 3d, 669, 680–81 (D. Md. 2024). Here, Tenkiang outlines four possible defenses: (1) that he was "not involved in the transactions" at issue because Plaintiff Jing was the one responsible for placing funds into accounts on Tenkiang's bitcoin and cryptocurrency platforms; (2) that any loss of money through the platforms resulted not from any fault on Tenkiang's part but from "the Chinese government's" seizure of the platforms; (3) that Tenkiang "was not aware of the products that [Plaintiff] Jing sold to his life insurance clients" and did not know that Plaintiff Jing had placed his clients' funds into the cryptocurrency accounts; and (4) that Tenkiang did not know Plaintiff Jing until 2020 and so could not have had any "involvement in the alleged facts prior to then." ECF 40, at 5–6.

In support of these defenses, Tenkiang offers only two pieces of evidence, the first being a copy of a contract executed between Plaintiff Abanda and CreditDap. *See* ECF 40-3. Tenkiang appears to read the contract as supporting his first defense, which contends that Plaintiff Jing brought in all clients "from his life insurance pool, created the contracts, accepted their money, gave it to his daughter [Lisa Jing], and then [Lisa] would house the money in their CreditDap bank account as the company's CEO." ECF 40, at 5–6. However, upon review of the contract, the Court cannot determine how the document supports Tenkiang's stated defense. As an initial matter, the contract does not actually say anything about which parties were responsible for its creation or which parties were responsible for account management. ECF 40-3, at 6. In addition, even if the contract did show that George and Lisa Jing were responsible for contracting with clients, Tenkiang does not make clear how that fact would serve as a defense to Plaintiffs' claim of unjust enrichment on which the Court entered default judgment against him. *See* ECF 36, at

29. Because the proffered evidence bears no relation to Tenkiang's purported defense, it does not offer any basis on which the Court could decide the pending motion in Tenkiang's favor.

Tenkiang's inclusion of his own affidavit as an additional piece of evidence in his reply does not alter the Court's conclusion that he has not presented the Court with a meritorious defense. The affidavit generally and vaguely denies involvement with any of the Defendant Companies, disclaims communication with any Plaintiff apart from Plaintiff Jing, and avers that Tenkiang did not receive any financial benefits from the contracts at issue. ECF 49-1, at 2. As an initial matter, the Court expresses some skepticism that a self-serving affidavit such as this one is relevant to the question of whether Tenkiang has a meritorious defense. *See Martinez v. Dart Trans, Inc.*, 547 F. Supp. 3d 1153, 1185 (D.N.M. 2021) (finding a "self-serving affidavit" insufficient as evidence of a purportedly meritorious defense). And again, even if the Court were to credit the affidavit, many of Tenkiang's attestations in his defense do not reach the underlying claims brought against him. Put differently, even if the Court were to assume that Tenkiang was not responsible for soliciting or creating the contracts between CreditDap and the individual Plaintiffs, that fact would have no relevance to the central issue in this action, *i.e.*, whether Tenkiang misappropriated client funds for his own personal use and thus whether he is liable for unjust enrichment. *See* ECF 1, at 10 ¶ 24. Apart from the self-serving affidavit and the example contract, Tenkiang does not offer any other evidence, and because the determination of a meritorious defense turns on the *evidence* presented by the defaulting party, the Court cannot conclude that Tenkiang has here presented a meritorious defense.

### i. *Tenkiang has not satisfied the requirements of Rule 60(b).*

In addition to the three factors detailed above, a party seeking to set aside an order of default judgment must satisfy at least one of the six enumerated grounds for relief under Rule 60(b). *Welsh*, 879 F.3d at 533. Here, Tenkiang argues only that he was never properly served and so his

delay represented excusable neglect under Rule 60(b)(1). ECF 40, at 4. Specifically, Tenkiang maintains that the summons and other correspondence in this action were sent to his childhood home, "where he has not resided for over ten years." *Id.* While Tenkiang was living first in Portugal and then in Washington, he says, his mother was resident at the Bear, Delaware address but "never accepted any mail sent to her home on [Tenkiang's] behalf" and only informed him of the default judgment order because "it [arrived in] a large, decorated envelope and seemed especially important." *Id.* at 4–5; *see also* ECF 40-2 (affidavit of Jessie Tenkiang).[9]

Plaintiffs disagree that Tenkiang had no notice of this action prior to the default judgment. They first point out that the record reflects that Tenkiang's mother accepted service of process on his behalf at the Bear, Delaware address on May 31, 2023, *see* ECF 20, following a private investigator's determination that Tenkiang did, in fact, reside at that address. ECF 46, at 4 (citing ECF 35-23, at 1 (affidavit of Plaintiffs' counsel)). The investigator made this determination in part by looking up Tenkiang's driver's license information and also by finding that Tenkiang had, in May 2023, provided the same address as his residence in connection with a failure to appear in the Court of Common Pleas for New Castle County, Delaware. *Id.* (citing ECF 35-23, at 4).

Moreover, Plaintiffs contend that, regardless of the propriety of service at the Delaware address, Tenkiang had notice of the action by the time he contacted Plaintiff Abanda through WhatsApp in May of 2023 to state his intention to deny all allegations and to countersue. *Id.* at 7

---

[9] Though it is not explicitly clear from either Tenkiang's memorandum or the affidavit itself, Jessie Tenkiang appears to be Tenkiang's mother. There is no visual evidence submitted reflecting that the judgment was packaged in a "decorated envelope" as described by Tenkiang, and no affidavit submitted by Tenkiang supports this description. ECF 40-1 (affidavit of Armel Tankiang), at 1 (noting only that he was "notified" of the Court's prior order "by his mother"). In fact, Jessie Tenkiang appears to deny receiving any documents at all and thus makes no mention in her short affidavit of a "decorated envelope." ECF 40-2, at 1 (affidavit of Jessie Tenkiang) (noting that Jessie Tenkiang never received any documents via hand delivery).

(citing ECF 46-1, at 2–3 (declaration of Plaintiff Abanda and copy of the message)).  Finally, Plaintiffs produce evidence that in early 2024, Tenkiang contacted the investigating firm to threaten the investigator responsible for attempting to serve him at the Delaware address.  *Id.* (citing ECF 46-2, at 2 (copy of email sent to Plaintiffs' counsel by the private investigating firm)).

Tenkiang replies that the information on his Delaware driver's license was out of date, generally denies that he provided the Delaware address as his home address in connection with the failure to appear issue, and avers that though the cell phone number indicated in the message thread has a Portuguese country code, it was not the number he used while living in Portugal.  ECF 49, at 3.  As supporting evidence, Tenkiang provides the abovementioned affidavit, *see* ECF 49-1, along with a copy of his Delaware state driving record showing that his license expired in 2015, *see* ECF 49-2, and a photograph of a check dated May 24, 2021, that was apparently sent from a Pennsylvania district court to "Zeshung Tenkiang" at "19 Rockhill Road, Apartment 2A, Balacynwyd, PA 19004," *see* ECF 49-3.

The Court credits that the address information associated with Tenkiang's driver's license may very well have been out of date.  However, the other evidence Tenkiang provides does not answer the key question of whether his delay in participating in this action was due to mistake or excusable neglect.  With respect to the affidavit, while Tenkiang generally asserts that he has not lived in Bear, Delaware since 2014 and that he did not send the May 2023 WhatsApp message,[10]

---

[10] The May 3, 2023 WhatsApp message appears to make explicit reference to the pending lawsuit, noting that the recipient was "the CEO of [O]urbloc during the occurrence of this" and further telling the recipient that the sender will "need [the recipient] present for the case."  ECF 46-1, at 3.  The message ends with an advisement wherein the sender notes that "[w]ith or without [the recipient's] cooperation[,] [w]e are denying all allegations and will counter sue."  *Id.*  Tenkiang notes in his affidavit that the "Portuguese number" from which the text message was sent "is in fact not mine and I did not send it."  ECF 49-1, at 1.  This sentence is confusing as it literally states that Tenkiang did not send the "Portuguese number," not the disputed WhatsApp message itself.

the Court is again mindful of the limited utility of a "self-serving affidavit" which is unaccompanied by supporting documentation but merely states "that the address of service was not [a party's] residency nor dwelling nor usual place of abode." *United States v. Veeraswamy*, 765 F. Supp. 3d 168, 193–94 (E.D.N.Y. 2025); *see also Celeritech Int'l Corp. v. Superstar Holdings Inc.*, 348 F.R.D. 127, 137 (S.D. Fla. 2024). The photograph of the check, meanwhile, indicates only that in May 2021, a Pennsylvania state court sent a check to Tenkiang at a Pennsylvania address. It does not speak to the private investigator's determination that two years later, in May 2023, just after this action was filed, Tenkiang gave the Bear, Delaware address as his place of residence in proceedings before the Court of Common Pleas of New Castle County, Delaware. *See* ECF 35-23, at 4.

By contrast, the evidence provided by Plaintiffs indicates that Tenkiang *was* aware of the pendency of this action well in advance of the default judgment and yet chose not to participate. The Court finds the information from the private investigator particularly helpful. Not only did the initial investigation reveal that Tenkiang provided the Bear, Delaware address as his place of residence in May 2023, *see* ECF 35-23, at 4, the investigating firm also had contact from Tenkiang on January 9, 2024, which it reported to Plaintiffs' counsel, *see* ECF 46-2. Notably, while Tenkiang contends that he is not the owner of the telephone number shown on the Plaintiffs' copy of the WhatsApp exchange at ECF 46-1, he does not deny or even address the evidence provided by the investigating firm beyond challenging the information obtained from his driving record. The picture before the Court thus strongly indicates that Tenkiang was, at a minimum, aware of this action in January 2024, close to eight months before the Court entered its order of default

However, Tenkiang's reply brief expressly "denies sending this text," ECF 49, at 3, thus the court will read the affidavit as Tenkiang denying the sending of the message via WhatsApp.

judgment, and yet chose not to respond. Accordingly, the Court concludes that Tenkiang has failed to sufficiently show good cause behind his long delay in participating in this action, and thus has failed to show mistake or excusable neglect under Rule 60(b)(1). The default judgment therefore stands.[11]

## B.    Motion for Attorneys' Fees

Having determined that the default judgment should not be vacated, the Court turns to Plaintiffs' motion for attorneys' fees. In its August 29, 2024 order, the Court entered judgment in favor of Plaintiffs "against CreditDap LLC as to count II (breach of contract) and against Armel Tenkiang as to count III (unjust enrichment), jointly and severally, in the amount of $1,125,618, and against CreditDap LLC in the additional amount of $1,362,7[33]," resulting in a total judgment of $2,488,351. ECF 37, at 1, 5. The Court also ordered that Plaintiffs submit a Rule 54(d) motion for costs, attorneys' fees, and other expenses.[12] *Id.* at 5. Two weeks later, on September 12, 2024, Plaintiffs filed the instant motion, basing their calculation for total attorneys' fees on the total

---

[11] Again, the Court recognizes the "strong policy" in the Fourth Circuit "that cases be decided on their merits." *Shaffer Equip. Co.*, 11 F.3d at 453. However, in addition to the foregoing analysis, the Fourth Circuit also disfavors entry of default judgment only against a single defendant in a multi-defendant case involving joint and several liability of the defendants or "closely interrelated" liability. *U.S. ex rel. Hudson v. Peerless Ins. Co.*, 374 F.2d 942, 945 (4th Cir. 1967); *see also Queen v. Ctr. for Sys. Mgmt., Inc.*, Civ. No. 10-3518-ELH, 2012 WL 4058044, at *2 (D. Md. Sept. 13, 2012) (Report and Recommendation by Magistrate Judge Gesner adopted by Judge Hollander on October 3, 2012); *Leighton v. Homesite Ins. Co. of the Midwest*, 580 F. Supp. 3d 330, 332–33 (E.D. Va. 2022). This policy aims to avoid inconsistency in the judgment, a risk that is present here given that, of the two Defendants against whom the Court entered default judgment, only Tenkiang, not CreditDap, has moved to set aside the judgment, even though the Court found that Tenkiang and CreditDap were jointly and severally liable.

[12] The contracts each include a provision allowing for recovery of attorneys' fees and costs by the prevailing party. *See* ECF 1-1, at 5; ECF 1-2, at 4; ECF 1-3, at 4; ECF 1-4, at 4; ECF 1-5, at 4; ECF 1-6, at 4; ECF 1-7, at 4; ECF 1-8, at 4; ECF 1-9, at 5; ECF 1-10, at 5; ECF 1-11, at 4; ECF 1-12, at 4; ECF 1-13, at 4; ECF 1-14, at 5; ECF 1-15, at 4; ECF 1-16, at 5; ECF 1-17, at 4; ECF 1-18, at 5.

$2,488,351 judgment. ECF 38, at 4–5. As noted, beyond challenging the default judgment, Tenkiang did not file any opposition to the motion seeking an award of attorneys' fees.

According to the terms of each contract executed between Plaintiffs and CreditDap, the prevailing party in a legal action brought to enforce the terms of the contracts is entitled to recover, "in addition to any other damages or award, all reasonable legal costs and fees associated with the action."[13] ECF 1-1, at 5; *see also* ECF 36, at 29 n.13 (locating the provision in each of the Plaintiffs' contracts). "A contractual obligation to pay attorneys' fees generally is valid and enforceable in Maryland."[14] *Atl. Contracting & Material Co., Inc. v. Ulico Cas. Co.*, 844 A.2d 460, 477 (Md. 2004); *see also Dominion Fin. Servs., LLC v. Pavlovsky*, 673 F. Supp. 3d 727, 754 (D. Md. 2023). Trial courts must assess any fee award request for "reasonableness."[15] *Myers v.*

---

[13] In their complaint, Plaintiffs requested judgment in the principal amount, plus interests and taxable costs, for all five counts, but only specifically requested reasonable attorneys' fees as relief for counts I (violation of securities laws), IV (securities fraud), and V (fraud in the inducement). ECF 1, at 32–33. Attorneys' fees for the counts arising under the CreditDap contracts, counts II (breach of contract) and III (unjust enrichment), are encompassed by the contracts' provision for payment of all reasonable legal costs associated with actions to enforce the contracts. *See supra*, n.10.

[14] Plaintiffs contend that because Pennsylvania law governs matters involving the CreditDap contracts, Pennsylvania law also governs their claims for attorneys' fees. ECF 38, at 2 (citing ECF 1-1, at 6 ¶ 20). However, they note that there is "no material difference[]" between the relevant Pennsylvania and Maryland laws and so reference Maryland law. *Id.* at 3. In accordance with the Plaintiffs' motion, the Court also references Maryland law in its analysis.

[15] "Maryland follows the 'American Rule,' under which a prevailing party is not awarded attorneys' fees unless (1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution." *Xerox Corp. v. SMS Prods., Inc.*, Civ. No. 21-01606-ELH, 2022 WL 13937486, at *9 (D. Md. Oct. 24, 2022) (other citations and internal quotation marks omitted). "In a statutory fee-shifting case, courts generally employ the 'lodestar method' in calculating what attorneys' fees and costs are to be awarded." *Cong. Hotel Corp. v. Mervis Diamond Corp.*, 28 A.3d 75, 83 (Md. App. 2011) (other citation omitted). "However," as Judge Coulson of this court noted, "the Maryland Court of Appeals has held that the lodestar approach is an inappropriate mechanism for calculating fee awards under contractual fee-shifting provisions in disputes between private parties over breaches of contract." *Wells Fargo Bank, N.A. v. Gateway Int'l Logistics, Inc.*, Civ. No. 22-

*Kayhoe*, 892 A.2d 520, 532 (Md. 2006). Rule 1.5 of the Maryland Rules of Professional Conduct

("MRPC") guides a court's analysis of the reasonableness of fee awards under contractual fee-

shifting provisions in breach of contract suits, as is the case here. *Dominion Fin. Servs.*, 673 F.

Supp. 3d at 754 (citing *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 7 A.3d 1, 7

(Md. 2010). MRPC Rule 1.5 provides that a court should consider

> (1) the time and labor required, the novelty and difficulty of the questions involved,
> and the skill requisite to perform the legal service properly; (2) the likelihood, if
> apparent to the client, that the acceptance of the particular employment will
> preclude other employment of the attorney; (3) the fee customarily charged in the
> locality for similar legal services; (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances; (6) the nature
> and length of the professional relationship with the client; (7) the experience,
> reputation, and ability of the attorney or attorneys performing the services; and (8)
> whether the fee is fixed or contingent.

"A court does not need to evaluate each factor separately, nor does it need to 'make explicit

findings with respect to [MRCP] Rule 1.5,' as long as the court 'utilizes the rule as its guiding

principle' for deciding reasonableness." *Dauda v. Jean*, Civ. No. 23-174-GLS, 2025 WL 947995,

at *4 (D. Md. Mar. 28, 2025) (quoting *Monmouth Meadows*, 7 A.3d at 10 n.13).

Based on Plaintiffs' hybrid fee arrangement with their counsel, which stipulated a

"discounted, blended" hourly rate of $300 plus 30% of any recovery, they calculate that they

should receive $787,346.29 in attorneys' fees, costs, and expenses. ECF 38 at 3, 5. Plaintiffs

calculate that Hyland Law PLLC billed them at $37,025 in fees and $349.19 in out-of-pocket

expenses, while GuideOn Legal Services, which assisted in the representation, billed $3,408 in

fees and $58.80 in expenses, for a total of $40,840.99. *Id.* at 3 (citing ECF 38-2 (billing record of

---

02487-JRR, 2023 WL 2473255, at *9 (D. Md. Mar. 13, 2023) (citing *Xerox Corp.*, 2022 WL
13937486, at *10). "Maryland courts consider the lodestar approach to be inappropriate in breach
of contract cases involving private parties because '[a] contractual fee-shifting provision is
designed by the parties, not by the legislature . . . . Thus, it usually serves no larger public purpose
than the interests of the parties.'" *Id.* (citing *Cong. Hotel Corp.*, 29 A.3d at 84).

Hyland Law PLLC) and ECF 38-3 (billing record of GuideOn Legal Services)). They calculate the 30% contingency fee amount, as applied to the total judgment of $2,488,351, at $746,505.29. *Id.* Additionally, each Plaintiff has "agreed to be responsible for a pre-determined allocated percentage of the fees and costs," ranging from 0.59% (for Plaintiff Fobella) to 39% (for Plaintiff Jing). *Id.* at 4–5. Plaintiffs explain this hybrid fee arrangement was arrived at both in light of the expected "challenges" in collecting the judgment and to make the Plaintiffs' out-of-pocket litigation costs more affordable. *Id.* at 9–10. In an affidavit, Plaintiffs' lead counsel Timothy Hyland specified that collection is expected to be difficult because "the assets believed available for satisfaction of a judgment are held in cryptocurrency accounts." ECF 38-1, at 4 ¶ 13.

Upon review of the billing statements and affidavits from counsel submitted by Plaintiffs, the Court is satisfied that the requested hourly fees are reasonable. The billing statements evince the length of time and the amount of effort required of Plaintiffs' counsel in this litigation, which has involved use of a private investigating firm and extensive work preparing the materials for default judgment. *See* ECF 38-2, at 2–26 and ECF 38-3, at 2–18. In addition, the record clearly reflects specificity in the more routine legal work done by counsel, including reviewing shared documents, meetings with clients and co-counsel, researching and drafting motions, and preparation of affidavits. *See, e.g.*, ECF 38-2, at 2–4.

Moreover, the hourly rate of $300 billed for this work reflects, according to the fee matrix used by judges in this district, the upper bounds for what lawyers admitted to the bar for five to eight years typically charge, while it represents the median fee for lawyers with nine to fourteen years of experience. Loc. R. Appendix B(3) (D. Md. 2025).[16] Here, each attorney for Plaintiffs

---

[16] "An analysis of the fee 'customarily charged in the locality for similar legal services' requires a court to consider 'the community in which the court sits [as] the first place [to evaluate] prevailing market rate." *Dauda*, 2025 WL 947995, at *8 (quoting *Thompson v. Dep't of Hous. & Urban*

has a minimum of nine years of experience and the $300 hourly rate is therefore well within the guidelines range.[17] And the approximately 120 hours of work involved in this action, which has included the lengthy default judgment process, is likewise reasonable. *C.f. Dominion Fin. Servs.*, 673 F. Supp. 3d at 755 (finding that a total of 166.8 hours of work on litigation involving a contested default judgment was reasonable); *Wei v. Xu*, Civ. No. 21-601-ELH, 2022 WL 1422926, at \*14–\*15 (D. Md. May 4, 2022) (determining that for an *un*contested default judgment, 72 hours of work was reasonable).

However, the Court is less certain that the contingency fee of 30% can be said to represent a reasonable fee in the context of a default judgment. The Court understands the argument that the 30% figure may well have appropriately been arrived at in consideration of affordability of representation for the Plaintiffs as well as anticipated difficulties in collecting the judgment, but it is doubtful whether it represents a recoverable attorneys' fee.

---

*Dev.*, Civ. No. 95-309-MGJ, 2002 WL 31777631, at \*12 (D. Md. Nov. 21, 2002). In this district, knowledge of the customary fee amounts is guided by the Local Rules, which set out the guideline ranges in Appendix B. *See* Loc. R. Appendix B(3) (D. Md. 2025); *see also Gonzalez v. Caron*, Civ. No. 10-2188-CBD, 2011 WL 3886979, at \*2 (D. Md. Sept. 2, 2011). At the same time, the Court is mindful that fee matrices are not the only factors to take into account when assessing the reasonableness of attorneys' fees and does not rely solely on them here. *See De Paredes v. Zen Nails Studio LLC*, 134 F.4th 750, 754 (4th Cir. 2025) (identifying "lawyer affidavits, fee awards in similar cases, general surveys, fee matrices," and the court's own personal knowledge as relevant to evaluations of fee requests).

[17] In affidavit, lead counsel Timothy Hyland attested that he was admitted to the Virginia State Bar in 1990, followed by admission to the Maryland State Bar and to the United States District Court for the District of Maryland in 2009. ECF 38-1, at 1 ¶ 4. Co-counsel Tyler Southwick graduated from law school in 2016 and was admitted to practice in Virginia that same year, *id.* at 2 ¶ 10, while co-counsel Elizabeth Dwyer received her law degree in 2010 and is admitted to practice in several jurisdictions, including Virginia, Maryland, D.C., the United States District Courts for the District of Maryland and the Eastern District of Virginia, and the United States Supreme Court, *id.* at 3 ¶ 10. Additionally, co-counsel Jamie Hertz received her law degree in 2003 and is likewise admitted to practice in multiple jurisdictions, *id.* at 3 ¶ 11, and co-counsel John Grimes received a J.D. in 2000, and L.L.M. in 2015, and a member of multiple bars, *id.* at 3 ¶ 12.

In reaching this conclusion, the Court finds instructive *Airlines Reporting Corp. v. Acad. Travel Servs. Int'l*, No. 111CV00965, 2012 WL 13020304 (E.D. Va. May 24, 2021), *report and recommendation adopted*, No. 1:11CV965, 2012 WL 13020807 (E.D. Va. July 12, 2012). There, like here, the trial court considered the recovery of attorneys' fees following default judgment based on both a contractual provision as well as on a private contingency fee arrangement. *Id.* at *8. Noting that district courts have supplemental jurisdiction over contingent fee contracts, the court explained that the mere existence of a contingency agreement does not alter the fact that district courts must independently assess the reasonableness of the fee request. *Id.* at *9 (citing *Allen v. United States*, 606 F.2d 432, 435 (4th Cir. 1979)). While the contract between plaintiff and defendants permitted recovery of reasonable attorney's fees, the court determined that there was "no evidence to suggest that [d]efendants were on notice that an award of attorney's fees [under the contract] would be predicated on a private contingency fee agreement." *Id.* at 10. The court reasoned that established precedent in other, statutory fee-shifting provisions, "such provisions only control 'what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer.'" *Id.* (quoting *Venegas v. Mitchell*, 495 U.S. 82, 90 (1990)). Instead, the duty of the court to "decide the fees that must be paid by an unconsenting defendant pursuant to a fee-shifting provision" does not extend to a plaintiff's private arrangement with their counsel. *Id.* n.12. The court in *Airlines Reporting Corporation* found this reasoning persuasive and determined that the plaintiff's "private contingency fee agreement [was] not controlling in determining a reasonable attorney's fee[.]" *Id.* at *11. And though there, as here, the plaintiff argued that the contingency fee was calculated to cover future collection efforts, the court found this determination too speculative. *Id.*

19

Ultimately, the *Airlines Reporting Corporation* court found that the private contingency fee agreement did not provide "a proper basis for a fee award" in this case and allowed the plaintiff only to recover a fee commensurate with the lodestar figure. 2012 WL 13020304, at *12. However, the plaintiff's attorneys there expended minimal effort in what the court determined was "a relatively routine and straightforward case that led to default judgment." *Id.* at *11. Here, the facts are more complicated, as Plaintiffs expended more effort in trying to track down and serve Tenkiang and have exerted additional resources in responding to Tenkiang's sudden appearance and motion to set aside the default judgment. Thus, a higher award of attorneys' fees beyond the agreed-upon hourly rate is warranted, even if it does not amount to the full 30% contingency fee. As noted above, the fee matrix that guides this Court and other judges in this district provides a general range of reasonable attorneys' fees, allowing for recovery of up to $425 per hour for attorneys with 20 or more years of experience.[18] The record submitted by Plaintiffs indicates that, of the attorneys at Hyland Law, Elizabeth Dwyer billed 13.4 hours, Jamie Hertz billed 51.8, Timothy Hyland billed 19.3, and Tyler Southwick billed 25.3, for a total of over 109 hours. *See* ECF 38-2, at 3–4. Meanwhile, John Grimes of GuideOn Legal Services billed approximately 11 hours of work. *See* ECF 38-3 (dividing total billed fees by the hourly rate of $300). Of these attorneys, as detailed in footnote 15, Hertz, Grimes, and Hyland have each been practicing for over 20 years, while Dwyer has been practicing for at least 14 and Southwick for 9. Out of the total approximately 120 hours spent on the case, the Court determines that the most senior attorneys accounted for nearly 70% of the billing hours. Because of this, the Court determines that an hourly

---

[18] The ranges are as follows: $150-$225 for attorneys admitted to the bar for fewer than five years; $165-$300 for attorneys admitted for five to eight years; $225-$350 for attorneys admitted for nine to fourteen years; $225-$350 for attorneys admitted for fifteen to nineteen years; and $300-$475 for attorneys admitted for twenty or more years. Loc. R. Appendix B(3) (D. Md. 2025).

billing figure of closer to the upper end of the rate indicated on the fee matrix for senior attorneys is an appropriate award here. The Court will therefore order CreditDap to pay Plaintiffs' attorneys' fees at a rate of $400 per hour, for approximately 120 hours worked, in the amount of $48,000, plus the additional $349.19 and $58.80 incurred as out of pocket costs, for a total of $48,407.99.[19] The judgment entered as to each individual Plaintiff will be calculated in the order according to the percentage chart provided by Plaintiffs in their motion. *See* ECF 38, at 4–5.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for attorneys' fees, ECF 38, is GRANTED in part and DENIED in part and Defendant Tenkiang's motion to vacate the default judgment, ECF 39, is DENIED.

A separate implementing Order will issue.

Dated: <u>July 7, 2025</u>

<u>            /s/            </u>
Brendan A. Hurson
United States District Judge

---

[19] While "there will most always be future collection efforts in a case where a default judgment is awarded," the Court must have a reasonably specific estimate of the collection costs to be incurred before advance awarding fees for future services. *Airlines Reporting Corp.*, 2012 WL 13020304, at *12. In the apparently likely event that collection does require expenditure of additional resources, Plaintiffs may submit supplemental briefing specifying the costs incurred. *See Airlines Reporting Corp. v. Sarrion Travel, Inc.*, 846 F. Supp. 2d 533, 540–41 (E.D. Va. 2012).